## Shenandoah Mobile Company v. Cumberland County Board of Assessment Appeals

530

C.P. of Cumberland County, no. 03-4921.

*Carl C. Risch,* for plaintiffs Shenandoah Mobile Co. and Shenandoah Personal Communications Co.
*Dusty Elias Kirk* and *Sharon F. DiPaolo,* for plaintiffs Spectrasite Communications and SBA Towers Inc.

*Mark A. Mateya,* for defendant County Commissioners Ass'n of Pa.

*Stephen D. Tiley,* for defendant Cumberland Cty. Bd. of Assessment Appeals.

*Philip H. Spare,* for interested parties Big Spring and South Middleton school districts.

OLER JR., *J.,* September 15, 2004—In these six cases, which have been consolidated by agreement of counsel because of a common question of law, plaintiffs are appealing from real estate tax assessments by defendant of plaintiffs' telecommunication tower facilities.[1] At issue on the appeals is the correctness of defendant's underlying classification of plaintiffs' telecommunication towers as realty as opposed to personalty for real estate tax purposes.[2]

The procedural history of the cases may be summarized as follows. On September 18, 2003, plaintiffs Shenandoah Mobile Company and Shenandoah Personal Communications Company filed a petition for appeal from defendant's tax assessment of their telecommunication towers.[3] Defendant filed an answer to plaintiffs'

1. The following cases have been consolidated at number 03-4921 civil term: numbers 03-4921 civil term, 04-920 civil term, 04-921 civil term, 04-922 civil term, 04-949 civil term, and 04-950 civil term. See order of court, April 16, 2004.

2. See pet. of appeal from determination of real estate tax assessment, filed September 18, 2003 (Shenandoah's pet. of appeal); pet. for appeal, filed March 4, 2004 (Spectrasite/South Middleton Township pet. for appeal); pet. for appeal, filed March 4, 2004 (Spectrasite/Upper Frankford Township pet. for appeal); pet. for appeal, filed March 4, 2004 (Spectrasite/Southampden Township pet. for appeal); pet. for appeal, filed March 5, 2004 (SBA Towers/South Newton Township pet. for appeal); pet. for appeal, filed March 5, 2004 (SBA Towers/East Pennsboro Township pet. for appeal).

3. Shenandoah's pet. of appeal.

petition on October 2, 2003,[4] and the case was listed for trial on January 7, 2004.[5] On March 4, 2004, plaintiff Spectrasite Communications filed three petitions for appeal, each listing the Cumberland County Board of Assessment Appeals as defendant, as well as Cumberland County and the local townships and school districts in which the towers were located as interested parties.[6] On March 5, 2004, plaintiff SBA Towers filed two petitions for appeal, each listing the Cumberland County Board of Assessment Appeals as defendant, as well as Cumberland County and the local townships and school districts in which the towers were located as interested parties.[7]

On April 13, 2004, plaintiff Spectrasite Communications filed a motion to consolidate the six cases pending against defendant.[8] On April 16, 2004, pursuant to an agreement of counsel, the court ordered the cases con-

4. Answer, filed October 2, 2003 (def.'s answer to Shenandoah's pet.).

5. Praecipe for listing case for trial, filed January 7, 2004.

6. See Spectrasite/South Middleton Township pet. for appeal (listing Cumberland County, South Middleton Township and South Middleton School District as interested parties); Spectrasite/Upper Frankford Township pet. for appeal (listing Cumberland County, Upper Frankford Township, and Big Spring School District as interested parties); Spectrasite/Southampden Township pet. for appeal (listing Cumberland County, Southampden Township, and Shippensburg Area School District as interested parties).

7. See SBA Towers/South Newton Township pet. for appeal (listing Cumberland County, South Newton Township, and Big Spring School District as interested parties); SBA Towers/East Pennsboro Township pet. for appeal (listing Cumberland County, East Pennsboro Township, and East Pennsboro School District as interested parties).

8. Mot. to consolidate, filed April 13, 2004 (Spectrasite's mot. to consolidate).

solidated, with filings to be made at number 03-4921 civil term.[9]

A pre-hearing conference was held on June 9, 2004,[10] and a two-day hearing was conducted on June 24, 2004, and June 28, 2004.[11]

For the reasons stated in this opinion, defendant's treatment of plaintiffs' telecommunication towers as realty for purposes of the county's tax on real property will be sustained.

## STATEMENT OF FACTS

Plaintiffs are Shenandoah Mobile Company, Shenandoah Personal Communications Company, Spectrasite Communications, and SBA Towers Inc.[12] Shenandoah, Spectrasite, and SBA Towers are all telecommunication tower companies which own towers throughout Pennsylvania.[13] Spectrasite and SBA Towers are also part of an industry group, along with Crown Communications and American Tower Company, which is cooperating in the coordination of real estate tax assessment appeals.[14] Defendant is the Cumberland County Board of Assessment Appeals.[15] The interested parties of record are Cumberland County, South Middleton Township, Upper Frankford Township, Southampden Township, East

---

9. Order of court, April 16, 2004.

10. In re pre-hearing conference, June 9, 2004.

11. Notes of testimony 2, hr'g., June 24, 2004, and June 28, 2004 (N.T. ___).

12. N.T. 1-2.

13. Stipulations of fact ¶2. pls.' exhibit 13, hr'g., June 24, 2004, and June 28, 2004 (Stipulations of fact ¶___).

14. Stipulations of fact ¶3.

15. N.T. 1-2.

Pennsboro Township, South Newton Township, South Middleton School District, Big Spring School District, Shippensburg Area School District, and East Pennsboro School District.[16]

For the sake of clarity, the word "tower" will be used when referencing the actual telecommunication towers, and the term "tower facility" will be used when referencing the tower, fence, concrete foundation and equipment building on each site. With respect to the types of towers, a monopole tower will be defined as a self-supporting, tubular tower which ranges 50-200 feet in height.[17] A lattice tower will be defined as a self-supporting, three- or four-legged tower which is widest at the bottom and tapers as it rises.[18] Lattice towers can reach heights of up to 1,000 feet.[19] Finally, it should be noted that plaintiffs lease the underlying land on which their tower facilities are located.[20] The assessments at issue in these cases were made only on plaintiffs' tower facilities; assessments on the leased land were separately issued to the landowners.[21]

These cases involve six telecommunication towers located in Cumberland County (identified as towers "A-F").[22] Tower "A," parcel number 25-25-0006-351 LL, is owned by Shenandoah Mobile Company.[23] It is a 70-foot monopole tower located at 102 Market Street, New

---

16. N.T. 1-2.
17. Stipulations of fact ¶4.
18. Stipulations of fact ¶4.
19. Stipulations of fact ¶4.
20. Stipulations of fact ¶10.
21. Stipulations of fact ¶12.
22. Stipulations of fact ¶¶5, 7.
23. Stipulations of fact ¶7.

Cumberland Borough, Cumberland County, Pennsylvania.[24] The lease for tower "A"'s facility commenced on August 23, 1999, and is a five-year lease, which will automatically be renewed, unless terminated by the tower company, through four more five-year periods.[25] The original assessment issued for the improvements at tower "A"'s facility specified an assessed value of $202,860, which was modified by the board of assessment appeals to $95,000.[26]

Tower "B," parcel number 43-06-0031-012 LL, is owned by Spectrasite Communications.[27] It is a 150-foot lattice tower located at 200 Center Road, Upper Frankford Township, Cumberland County, Pennsylvania.[28] The lease for tower "B"'s facility commenced on June 3, 1998, and is a four-year lease, which will automatically be renewed, unless terminated by the tower company, through four more five-year periods.[29] The original assessment issued for the improvements at tower "B"'s facility specified an assessed value of $217,560, which was modified by the board of assessment appeals to $142,000.[30]

Tower "C," parcel number 39-12-0324-004 LL, is owned by Spectrasite Communications.[31] It is a 180-foot lattice tower located at 44 Kline Road, Southampton Township, Cumberland County, Pennsylvania.[32] The

24. Stipulations of fact ¶7.
25. Stipulations of fact ¶11.
26. Stipulations of fact ¶13.
27. Stipulations of fact ¶7.
28. Stipulations of fact ¶7.
29. Stipulations of fact ¶11.
30. Stipulations of fact ¶13.
31. Stipulations of fact ¶7.
32. Stipulations of fact ¶7.

lease for tower "C" 's facility commenced on March 6, 1998, and is a five-year lease, which will automatically be renewed, unless terminated by the tower company, through five more five-year periods.[33] The original assessment issued for the improvements at tower "C" 's facility specified an assessed value of $244,860, which was modified by the board of assessment appeals to $136,530.[34]

Tower "D," parcel number 40-10-0632-016 LL, is owned by Spectrasite Communications.[35] It is a 160-foot lattice tower located at 1500 Holly Pike, South Middleton Township, Cumberland County, Pennsylvania.[36] The lease for tower "D" 's facility commenced on August 22, 1998, and is a five-year lease, which will automatically be renewed, unless terminated by the tower company, through four more five-year periods.[37] The original assessment issued for the improvements at tower "D" 's facility specified an assessed value of $221,060, which was modified by the board of assessment appeals to $136,530.[38]

Tower "E," parcel number 09-22-0533-001 LL, is owned by SBA Towers.[39] It is a 120-foot monopole tower located at 4404 Industrial Park Road, East Pennsboro Township, Cumberland County, Pennsylvania.[40] The lease for tower "E" 's facility commenced on January 1,

33. Stipulations of fact ¶11.
34. Stipulations of fact ¶13.
35. Stipulations of fact ¶7.
36. Stipulations of fact ¶7.
37. Stipulations of fact ¶11.
38. Stipulations of fact ¶13.
39. Stipulations of fact ¶7.
40. Stipulations of fact ¶7.

2001, and is a five-year lease, which will automatically be renewed, unless terminated by the tower company, through four more five-year periods and one period of four years and 11 months.[41] The original assessment issued for the improvements at tower "E"'s facility specified an assessed value of $244,860, which was modified by the board of assessment appeals to $70,000.[42]

Tower "F," parcel number 41-11-0304-019 LL, is owned by SBA Towers.[43] It is a 195-foot lattice tower located at 212 Hammond Road, South Newton Township, Cumberland County, Pennsylvania.[44] The lease for tower "F"'s facility commenced on November 21, 1997, and is a five-year lease, which will automatically be renewed, unless terminated by the tower company, through four more five-year periods and one period of four years and 11 months.[45] The original assessment issued for the improvements at tower "F"'s facility specified an assessed value of $244,860, which was modified by the board of assessment appeals to $100,000.[46]

Cumberland County is a fourth class county.[47] The predetermined assessment ratio for real estate in Cumberland County is 100 percent.[48] The above assessment values which were determined by the Cumberland County board of assessment appeals represent the fair

---

41. Stipulations of fact ¶11.
42. Stipulations of fact ¶13.
43. Stipulations of fact ¶7.
44. Stipulations of fact ¶7.
45. Stipulations of fact ¶11.
46. Stipulations of fact ¶13.
47. See Act of August 9, 1955, P.L. 323. §210, *as amended,* 16 P.S. §210.
48. Stipulations of fact ¶15.

market value of each of the tower facilities.[49] The common level ratio, which is set at 95.4 percent for Cumberland County, is not implicated as a factor in these cases because it does not vary by more than 15 percent from the predetermined ratio.[50]

Much of the testimony at the hearing focused on the question of whether plaintiffs' towers were, or were at least intended to be, permanent fixtures at the tower facilities. This testimony included explanations about the erection and disassembly of telecommunication towers, reasons for removing or replacing towers, and general trends in the tower industry pertaining to the erection and removal of towers.

The process of erecting a tower begins with the submission of bids.[51] The bid forms are broken down by the tasks which need to be performed.[52] These tasks include, but are not limited to, foundation work, tower erection, electrical work, fencing, and landscaping.[53] After bids have been submitted and jobs awarded, preparation of the tower facility site begins, including erecting a fence, clearing the trees and vegetation, grading, stoning, and matting.[54] Sometimes it is also necessary to have an access road constructed from the highway or roadway to the tower facility site.[55]

---

49. Stipulations of fact ¶15.

50. Stipulations of fact ¶15.

51. N.T. 146.

52. See pls.' exhibit 3, hr'g., June 24, 2004 and June 28, 2004 (pls.'/def.'s exhibit ___); pls.' exhibit 5; pls.' exhibit 6.

53. N.T. 145-48; pls.' exhibit 3; pls.' exhibit 5; pls.' exhibit 6.

54. N.T. 146-47.

55. N.T. 147.

The first step in the actual erection of either a monopole or a lattice tower is the laying of the concrete mat and pier foundation.[56] Leonard Greisz, a director of internal controls compliance with Shenandoah, and Patrick Doyle, an employee of Crown Castle, testified as to this procedure.[57] Their testimony was corroborated by Patrick O'Reilly, a director of field operations for Spectrasite, and Andrew Getsy, a field operations manager for SBA.[58] First, engineers conduct a geotechnical analysis to determine whether they will be drilling in soft dirt, hard dirt, or bedrock.[59] The softer or looser the ground is, the deeper the concrete foundation must be.[60] After the needed depth of the foundation is determined, the ground is drilled, and rebar cages are placed in the ground.[61] Bolts are then placed inside the rebar cages, and the cement is poured.[62] Additionally, Mr. O'Reilly testified that instead of a mat and pier foundation, lattice towers may have a straight caisson under each leg of the tower.[63] A straight caisson is simply an individual concrete foundation under each leg of the tower which is about eight feet in diameter, and anywhere from 20 to 30 feet deep.[64] Otherwise, a straight caisson is created in the same manner as the mat and pier foundation.[65]

---

56. N.T. 140.
57. N.T. 27-28, 99.
58. N.T. 204-205, 221.
59. N.T. 48.
60. N.T. 48.
61. N.T. 140.
62. N.T. 140.
63. N.T. 213.
64. N.T. 213.
65. See N.T. 213.

Mr. Greisz and Mr. Doyle next testified about the erection of towers. While the cement is curing, the next stage of erecting the tower proceeds.[66] Usually workers will begin constructing the individual sections of the tower during this time.[67] After the cement has cured, a crane lifts the first section of the tower over the bolts and onto the mat and pier foundation.[68] A lock washer is then placed over the bolts, and, finally, a large nut is used to securely fasten the tower to its foundation.[69] After the first segment of the tower has been securely fastened to its foundation, the remaining segments of the tower are moved into place by crane and attached to the previous segments of the tower until the entire tower has been erected.[70] After the tower has been erected, lights will be attached to it and electricity will be run to it, making the tower ready to host antennas.[71]

During the hearing, Mr. Doyle also gave extensive testimony on the disassembly process for telecommunication towers as he narrated a videotape showing the disassembly of a tower in West Virginia.[72] The West Virginia tower was a 180-foot lattice tower which was composed of nine sections and over 100 parts.[73] Before any disassembly could begin, the lights were taken off the tower, and the tower facility site was de-energized.[74] Addition-

---

66. N.T. 140-41.
67. N.T. 140.
68. N.T. 42, 141.
69. N.T. 42, 141-42.
70. See N.T. 42-43, 114; see also, def.'s exhibit 1.
71. See N.T. 147, 156-57.
72. N.T. 110, 114; pls.' exhibit 35.
73. N.T. 114-15.
74. N.T. 156-57.

ally, any antennas or co-axle cables which would have been attached to the tower would also have had to have been taken down or disconnected before disassembly could begin.[75]

Once these preliminary matters had been addressed, riggers ascended the tower and securely attached the strapping from the crane to the top section of the tower.[76] The riggers then began unfastening the bolts which held the top section of the tower in place, and, once the section was loose, the crane lowered the section to the ground.[77] The riggers then moved down to the next section of the tower, attached the crane's strapping, unfastened the bolts, and lowered the section to the ground.[78] The tower sections were not disassembled before they were taken away from the site unless they were too large to transport.[79] Once the sections became too large to transport, the sections were disassembled and the parts were categorized before being taken away.[80] Eventually, the riggers unbolted the final section of the tower, which was the section attached to the concrete foundation.[81] After the last section had been unbolted from the foundation and disassembled, the riggers cleaned up the site, the last of the tower pieces were taken away, and the tower disassembly was complete.[82]

---

75. See N.T. 157-58.
76. N.T. 116-17.
77. N.T. 117-18.
78. N.T. 118-19.
79. N.T. 119.
80. N.T. 119.
81. N.T. 131.
82. N.T. 131-35.

The entire disassembly process for the West Virginia tower lasted about 12 hours.[83] Mr. Doyle testified that the time period which was required to disassemble the West Virginia tower was longer than the time normally needed to disassemble a lattice tower because the access to the site was poor, and there was little room at the site for the cranes and trucks to move around.[84] Additionally, Mr. Doyle testified that disassembling a monopole tower would be a much simpler process than disassembling a lattice tower.[85] After the antennas and power cables have been removed, disassembling a monopole tower requires loosening the foundation bolts, using a crane to pick the tower up and lay it on its side, and disassembling the tower segments once the tower has been laid on the ground.[86]

Once a tower has been disassembled, only the cement foundation, equipment building, and fence are left at the site.[87] These parts of the facility are not damaged during disassembly, and could be used if another tower were later erected at the site.[88] In fact, the fencing and cement foundation are removed from the site only if their removal is a specified condition in the lease.[89]

---

83. See N.T. 126, 135.

84. N.T. 126-27.

85. N.T. 150-51, 170-71.

86. N.T. 150-51, 170-71.

87. N.T. 55.

88. See N.T. 55, 144-45, 207. The lack of any damage to parts of the tower facility during disassembly is evidenced by the tower industry's occasional "drop and swap" practice, in which one tower is taken down at a site, only to be replaced at the site by another—usually taller—tower. N.T. 144-45.

89. N.T. 55.

The towers themselves are also reusable after disassembly.[90] The only parts of the towers which must be replaced after disassembly are the bolts which hold the pieces and sections of the tower together.[91] Additionally, any pieces of the tower which are damaged during disassembly also must be replaced before the tower can be reassembled.[92] Otherwise, the towers can either be transported to a new site and erected, or put in a storage facility until they are needed for another site.[93]

During the hearing, the witnesses testified to a number of reasons that towers might be disassembled and moved to another location. The major reason cited for tower removal was a change in business circumstances.[94] For example, if there were a population shift and a tower were no longer needed in one area, but instead needed in a more densely populated area, then the tower would be moved into the more densely populated area.[95] Additionally, there might be times when a tower would no longer be a sufficient height; therefore, the original tower would be disassembled and a taller tower would be erected in its place.[96] This procedure is referred to in the industry as a "drop and swap."[97] Finally, sometimes a company will build a spec site, which is a tower facility that is built in anticipation that companies will eventually want to attach antennas to it.[98] If the tower were to become

90. N.T. 139.
91. N.T. 138.
92. N.T. 120, 156.
93. N.T. 120, 139.
94. N.T. 60-62, 196.
95. N.T. 64.
96. N.T. 144.
97. N.T. 144-45.
98. N.T. 159.

financially unviable because companies did not attach antennas to it, or if zoning requirements mandated that the tower be taken down because of non-use, then the tower would have to be taken down.[99]

Notwithstanding the availability of technology to disassemble a tower, the process is highly laborious, expensive, and demanding in terms of expertise, courage, and equipment. Furthermore, notwithstanding the theoretical reasons recounted above for taking down or moving towers, the practice in the telecommunication tower industry is that these towers are not being taken down or moved on a frequent basis.[100]

Mr. Greisz testified that, during the almost 10 years in which he has worked for Shenandoah, he could not remember a tower that was built where the lease was terminated and the tower was taken down.[101] Mr. Doyle testified that, of the well over 400 towers which his company owns in Pennsylvania, his company is considering moving or taking down only 30 of the sites.[102] Mr. O'Reilly testified that, of the 2,200 towers which Spectrasite owns in the northeastern United States, only 10 have been or are in the process of being moved or swapped, none of which are located in Pennsylvania.[103] Mr. Getsy testified that, of the over 400 towers which SBA Towers owns in Pennsylvania, he was not aware of any being removed.[104]

---

99. N.T. 196-97.
100. See N.T. 27-28, 74, 103, 109-10, 215, 226.
101. N.T. 27-28, 74.
102. N.T. 103, 109-10.
103. N.T. 215.
104. N.T. 226.

Finally, plaintiffs called Brian Kostel, a senior tax accountant for Crown Castle.[105] Mr. Kostel testified that, according to an advisory letter issued by the Pennsylvania Department of Revenue, telecommunication towers which are bolted to their foundations, instead of being sunk into their foundations, are considered personal property, thus subjecting the rental space on the towers to sales tax.[106]

## DISCUSSION

### *Statement of Law*

*Assessability of real estate.* Section 201 of the Fourth to Eighth Class County Assessment Law provides for the assessment of all real estate in the county:

"The following subjects and property shall as hereinafter provided be valued and assessed and subject to taxation for all county, borough, town, township, school, (except in cities), poor and county institution district purposes, at the annual rate,

"(a) All real estate to wit: houses, house trailers and mobile homes permanently attached to land or connected with water, gas, electric or sewage facilities, buildings, lands, lots of ground and ground rents, trailer parks and parking lots, mills and manufactories of all kinds, all office type construction of whatever kind, that portion of a steel, lead, aluminum or like melting and continuous casting structures which enclose, provide shelter or protection from the elements for the various machinery,

---

105. N.T. 230.
106. N.T. 234-35; pls.' exhibit 9.

tools, appliances, equipment, materials or products involved in the mill, mine manufactory or industrial process, and all other real estate not exempt by law from taxation. . . ." Act of May 21, 1943, P.L. 571, §201, *as amended,* 72 P.S. §5453.201.

*Assessment of chattels as real property for real estate taxation.* As a general proposition in real property law, there are three classifications for chattels that are used in connection with real estate:

"First, those which are manifestly furniture, as distinguished from improvements, and not peculiarly fitted to the property with which they are used; these always remain personalty. . . . Second, those which are so annexed to the property that they cannot be removed without material injury to the real estate or to themselves; these are realty, even in the face of an expressed intention that they should be considered personalty . . . . Third, those which, although physically connected with the real estate, are so affixed as to be removable without destroying or materially injuring the chattels themselves, or the property to which they are annexed; these become part of the realty or remain personalty, depending upon the intention of the parties at the time of the annexation; in this class fall such chattels as boilers and machinery affixed for the use of an owner or tenant but readily removable." *Clayton v. Lienhard,* 312 Pa. 433, 436-37, 167 A. 321, 322 (1933). (citations omitted)

The court in *In re Sheetz Inc.,* 657 A.2d 1011 (Pa. Commw. 1995), elaborated on the third classification of chattels, setting out a test for determining whether a chattel has become a fixture of real property for purposes of real estate taxation. *Id.* at 1013. The considerations which

must be taken into account when making this determination are "(1) *the manner in which [the chattel] is physically attached or installed,* (2) *the extent to which it is essential to the permanent use of the building or other improvement, and* (3) *the intention of the parties who attached or installed it." Id.* (emphasis in original) The intention of the parties is the most important consideration to examine, with the first two considerations acting as "objective manifestations that aid in determining the intention of the parties." *Id.* at 1014. Furthermore, permanence is not to be equated with perpetuity, but rather with the intention to "remain where affixed until worn out, until the purpose to which the realty is devoted is accomplished or until the item is superseded by another item more suitable for the purpose." *Id.* (quoting *Michigan National Bank v. City of Lansing,* 96 Mich. App. 551, 554, 293 N.W.2d 626, 627 (1980)).

In *Sheetz,* the Commonwealth Court held that canopies which cover gas pumps at gas stations are fixtures of real property, and hence are taxable as such similar facilities. *Id.* The court held that the canopies were affixed to a poured concrete foundation by bolts, which were then covered by concrete. *Id.* Next, the court held that the canopies were essential to the permanent use of the gas pumps because stations with canopies had a higher sales volume. *Id.* Additionally, the canopies' essential nature was demonstrated through Sheetz' seeking variances of zoning requirements in a number of cases to allow for the erection of canopies at their stations. *Id.* These facts led the court to conclude that Sheetz intended the canopies to be a permanent fixture of its gas stations which would remain until they were worn out, or Sheetz no longer occupied the premises. *Id.*

Finally, the Court of Common Pleas of Dauphin County, Bratton, J., has in a recent decision addressed the specific issue of real estate taxation of telecommunication towers. In holding that the tower was real property for purposes of real estate taxation, Judge Bratton noted that although the tower itself could be removed without injury to the tower, the concrete foundation to which the tower was attached could not be removed without causing injury to the real estate. See *e.g., Shenandoah Mobile Company v. Dauphin County Board of Assessment Appeals,* docketed at 2003 CV 3196 TX, Dauphin County, 2004, PICS case no. 04-1456 (Dauphin Cty. May 24, 2004).

### Application of Law to Facts

In the court's view, plaintiffs' telecommunication towers are properly classified as realty for purposes of Pennsylvania's real property taxation scheme. An analysis of the considerations set forth in *Sheetz* leads to this conclusion.

First, the towers are firmly affixed to the ground, and, although their removal is not a practical impossibility, the process involves a high degree of expense, manpower, equipment, and skill. Second, the towers are essential to the use of the rest of the facility, which is clearly real estate.

Third, and perhaps most important, the intent of the parties that the towers be features of the real estate as opposed to transient items of personalty is manifest in the extended terms of the leases and the practice of the industry, whereby dismantling of towers is almost exclusively a theoretical matter.

## ORDER

And now, September 15, 2004, after careful consideration of the tax assessment appeals filed herein, following a hearing, and for the reasons stated in the accompanying opinion, it is ordered as follows:

With respect to parcel number 25-25-0006-351 LL:

The market value as of January 1, 2004 (and for succeeding years until revised), for the parcel owned by Shenandoah Mobile Company, situated in New Cumberland Borough, Cumberland County, Pennsylvania, is fixed at $95,000.

The pertinent common level ratio for Cumberland County has been stipulated to be 95.4 percent. The predetermined ratio is 100 percent.

There being a difference of less than 15 percent between the common level ratio and predetermined ratio, as a result of which assessments are to be determined by application of the predetermined ratio, the assessment with respect to the aforesaid parcel is fixed at $95,000 as of January 1, 2004, for county and municipal taxes, and July 1, 2004, for school real estate taxes.

With respect to parcel number 43-06-0031-012 LL:

The market value as of January 1, 2004 (and for succeeding years until revised), for the parcel owned by Spectrasite Communications, situated in Upper Frankford Township, Cumberland County, Pennsylvania, is fixed at $142,000.

The pertinent common level ratio for Cumberland County has been stipulated to be 95.4 percent. The predetermined ratio is 100 percent.

There being a difference of less than 15 percent between the common level ratio and predetermined ratio, as a result of which assessments are to be determined by application of the predetermined ratio, the assessment with respect to the aforesaid parcel is fixed at $142,000 as of January 1, 2004, for county and municipal taxes, and July 1, 2004, for school real estate taxes.

With respect to parcel number 39-12-0324-004 LL:

The market value as of January 1, 2004 (and for succeeding years until revised), for the parcel owned by Spectrasite Communications, situated in Southampton Township, Cumberland County, Pennsylvania, is fixed at $136,530.

The pertinent common level ratio for Cumberland County has been stipulated to be 95.4 percent. The predetermined ratio is 100 percent.

There being a difference of less than 15 percent between the common level ratio and predetermined ratio, as a result of which assessments are to be determined by application of the predetermined ratio, the assessment with respect to the aforesaid parcel is fixed at $136,530 as of January 1, 2004, for county and municipal taxes, and July 1, 2004, for school real estate taxes.

With respect to parcel number 40-10-0632-016 LL:

The market value as of January 1, 2004 (and for succeeding years until revised), for the parcel owned by Spectrasite Communications, situated in South Middleton Township, Cumberland County, Pennsylvania, is fixed at $136,530.

The pertinent common level ratio for Cumberland County has been stipulated to be 95.4 percent. The predetermined ratio is 100 percent.

There being a difference of less than 15 percent between the common level ratio and predetermined ratio, as a result of which assessments are to be determined by application of the predetermined ratio, the assessment with respect to the aforesaid parcel is fixed at $136,530 as of January 1, 2004, for county and municipal taxes, and July 1, 2004, for school real estate taxes.

With respect to parcel number 09-22-0533-001 LL:

The market value as of January 1, 2004 (and for succeeding years until revised), for the parcel owned by SBA Towers Inc., situated in East Pennsboro Township, Cumberland County, Pennsylvania, is fixed at $70,000.

The pertinent common level ratio for Cumberland County has been stipulated to be 95.4 percent. The predetermined ratio is 100 percent.

There being a difference of less than 15 percent between the common level ratio and predetermined ratio, as a result of which assessments are to be determined by application of the predetermined ratio, the assessment with respect to the aforesaid parcel is fixed at $70,000 as of January 1, 2004, for county and municipal taxes, and July 1, 2004, for school real estate taxes.

With respect to parcel number 41-11-0304-019 LL:

The market value as of January 1, 2004 (and for succeeding years until revised), for the parcel owned by SBA Towers Inc., situated in South Newton Township, Cumberland County, Pennsylvania, is fixed at $100,000.

The pertinent common level ratio for Cumberland County has been stipulated to be 95.4 percent. The predetermined ratio is 100 percent.

There being a difference of less than 15 percent between the common level ratio and predetermined ratio,

as a result of which assessments are to be determined by application of the predetermined ratio, the assessment with respect to the aforesaid parcel is fixed at $100,000 as of January 1, 2004, for county and municipal taxes, and July 1, 2004, for school real estate taxes.